FILED '11 MAY 25 14:31 USDC-ORE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CASCADIA WILDLANDS ; and OREGON
WILD,

Plaintiffs,

v.

UNITED STATES FOREST SERVICE, an
administrative agency of the United States
Department of Agriculture,

Defendant,

And

SENECA SAWMILL COMPANY,

Defendant-Intervenor

10-CV-6337-TC

ORDER

COFFIN, Magistrate Judge:

This an action for declaratory and injunctive relief. The complaint arises under the

Administrative Procedure Act (APA), 5 U.S.C. § § 701 et seq., and alleges violations of the

National Environmental Policy Act (NEPA), 42 U.S.C. § § 4321 et seq.

Page 1 - ORDER

Plaintiffs Cascadia Wildlands and Oregon Wild contend that Defendant United States Forest Service violated federal law by not preparing a new or supplemental environmental assessment for the Trapper Timber Sale on the Willamette National Forest in Oregon. Plaintiffs contend that such is necessary due to changed circumstances and new information. Seneca Sawmill Company has intervened in this action because Seneca holds the contract for the timber harvest related to the Trapper Project.

Presently before the court are cross-motions for summary judgment from plaintiffs, defendant and defendant-intervenor (#19, #29 and #26).

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). There must be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is missing. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, the burden shifts to the nonmovant to produce specific evidence to establish a genuine issue of material fact or to establish the existence of all facts material to the claim. *Id.; see also, Bhan v. NME Hosp., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000). In order to meet this burden, the nonmovant "may not rely merely on allegations or denials

Page 2 - ORDER

in its own pleading," but must instead "set out specific facts showing a genuine issue of fact for trial." Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. *Anderson*, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* On the other hand, if, after the court has drawn all reasonable inferences in favor of the nonmovant, "the evidence is merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

## II. SYNOPSIS OF ISSUES

1. Summary of the Trapper Project

The following description of the Trapper Project is taken largely from the Government's briefing to the court. References to the administrative record are denoted "AR."

The Trapper Project is a landscape management project situated in a portion of the Willamette National Forest referred to as the Central Cascades Adaptive Management Area ("CCAMA"). The CCAMA is an Adaptive Management Area ("AMA"), which is a type of land allocation defined in the Interagency Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl (the "Northwest Forest Plan" or "NWFP"). *See* AR 2371.0001. The purpose of AMAs is to "encourage the development and testing of technical and social approaches to achieving desired ecological, economic, and other social objectives." AR 4226. AMAs are recognized as areas where innovation, testing, and experimentation are both expected and appropriate. *Id.* They are places where learning leads to validating or changing how resources are managed.

Page 3 - ORDER

Within the CCAMA, the Forest Service developed a forest management study called the Blue River Landscape Strategy ("BRLS"). AR 4219. The BRLS is a forest management strategy that consists of "a recommended landscape management and watershed restoration plan; an administrative study designed to measure effects on the ground and a series of analyses of landscape effects over time." AR 4219-22. This strategy is the implementation of a hypothesis that, over time, a landscape can be developed with a pattern and structure based to some degree on historical disturbance regimes -- particularly fire. AR 4222.

In order to obtain the above-described landscape, the BRLS proposed a landscape management system establishing both an area of "reserves" where no harvesting activities would occur, as well as three distinct landscape areas where timber harvest and fire would be used to alter forest conditions. The Forest Service would allow timber harvests in this area to attempt to approximate the important aspects of the frequency, severity, and spatial extent of historic fires. AR 4222. In a similar vein, the Forest Service would retain abundant down and standing live and dead woody material to approximate the important habitat structures left after a fire. AR 4222. The purpose of this BRLS management strategy is to seek to "restore" the pattern of the landscape over a period of many decades while meeting the objectives of the NWFP, which include providing timber products; sustaining native habitats, species, and ecological processes; and meeting Aquatic Conservation Objectives.

For the three harvest areas identified in the BRLS, the Forest Service proposed three different timber projects: The Blue River Face Timber Sale, which implemented a thirty-percent canopy

closure[1] prescription to reflect historic partial stand replacement fires;[2] the North Fork Quartz Timber Sale, which implemented a fifty-percent canopy closure prescription to reflect lower intensity historic fires; and the Trapper Project. AR 4410.

The Forest Service designed the Trapper Project to implement the third prescription from the BRLS to reflect stand structures resulting from historic high severity stand replacement fires and partial-stand replacement fires. AR 4225. To achieve this condition, the Forest Service will allow timber harvest, which will generally remove smaller-diameter trees leaving the bigger trees in a scattered and clumped pattern; additionally between 3 and 24 live trees per acre will be retained for snag creation. AR 4278. 4280. Following harvest, the Forest Service will then use a moderate intensity prescribed fire and snag creation to reduce the live canopy to an across-the - stand average of approximately fifteen-percent. If the Forest Service does not attain a fifteen percent canopy closure during the prescribed burn, additional trees will be felled with standard snag creation techniques. Following these treatments, all dead trees will be left standing to reflect the mortality historically seen following stand replacement fires. AR 4235, 4375, 4402. The Project also includes additional actions such as road maintenance, road decommissioning, and mitigation measures planned to protect soil, water, special habitats, heritage areas, and wildlife species. AR 4402.

---

[1] A canopy is defined as "the more-or-less continuous cover of branches and foliage formed collectively by the crown of adjacent trees and other woody growth." AR 2098. Canopy closure, therefore, is the percentage of ground covered by a canopy.

[2] A timber stand is defined as an "aggregation of trees or other vegetation occupying specific area and sufficiently uniform in species composition age arrangement and condition as to be distinguishable from the forest or other vegetation or land cover on adjoining areas." A stand replacement fire implies that a sufficient amount of vegetation that signifies an area as a timber stand has been killed through fire.

On May 12, 2003, the Forest Service approved the Trapper Project in a decision notice stating that after reviewing the Project's environmental assessment (EA) and the underlying studies and analyses, the Forest Service made a finding of no significant impact to the environment (FONSI). AR 4398. The issuance of the FONSI marks the completion of the NEPA process unless the agency makes substantial changes in the proposed action relevant to environmental concerns, or significant new information arises that will affect the quality of the environment "in a significant manner or to a significant extent not already considered." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989). Plaintiffs in this action challenge the Forest Service's position that NEPA does not require further environmental analysis for the Trapper Project.

2.  NEPA Overview

NEPA is a procedural statute requiring the federal government to consider the potential impacts of, and possible alternatives to, decisions that constitute major federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331, 4332; 40 C.F.R. § 1501.1. Its dominant purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions in advance of a final decision to proceed with that action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making. *Robertson*, 490 U.S. at 350; *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000) ("NEPA does not mandate particular substantive results, but instead imposes only procedural requirements") (internal quotations marks and citation omitted);

*Marsh*, 490 U.S.at 371. Instead, NEPA exists so "that [an] agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.*

NEPA requires the preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (C). Under NEPA's implementing regulations, promulgated by the Council on Environmental Quality ("CEQ")and codified at 40 C.F.R. Parts 1500–1517, federal agencies can comply with NEPA in one of three ways. First, an agency may always prepare an EIS. 40 C.F.R. § 1501.3. Second, to determine whether an EIS is required, an agency may prepare an EA. 40 C.F.R. §§ 1501.4(b), 1508.9. An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. "If the agency concludes there is no significant effect associated with the proposed project, it may issue a FONSI in lieu of preparing an EIS." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see also* 40 C.F.R. § 1508.9(a)(1). Third, the agency need not prepare an EA or an EIS if the agency determines that the proposed action falls within a "categorical exclusion" or "CE." *See* 40 C.F.R. §§ 1501.4(a)(2), 1501.4(b).

NEPA challenges to an agency's decision not to supplement an environmental document are reviewed under the APA. Upon review, the court shall "hold unlawful and set aside agency actions ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2). An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of a problem, or offered an explanation that runs counter to the evidence before the agency or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*).

3. Plaintiff's Challenge to the Forest Service's Decision Not to Supplement the Trapper Project EA of 2003

Plaintiffs note that the Forest Service began planning the Trapper Sale in 1998 and approved the final decision in 2003, selling 149 acres of mature public forests in the McKenzie River Watershed to Seneca. Although the Forest Service anticipated that logging would be completed by 2005 (AR 4399), it has given Seneca eight contract extensions due to poor market conditions and other delays and thus the Timber Sale has yet to be implemented (AR 4569, 4571, 4573, 4606, 4610, 4616, 4783, 5005). Plaintiffs further contend that during this eight year hiatus since the Trapper EA and FONSI, the circumstances and information available to the Forest Service have changed in three significant respects. To quote from plaintiff's opening brief in support of its motion for summary judgment:

> First, the passage of time has demoted, if not eliminated, the primary
> reason the Forest Service planned and approved the Trapper Timber
> Sale: to monitor and study the effectiveness of logging treatments as
> a way to mimic natural disturbances. AR 4219-22, 4410-11, 5018.
> Research and monitoring were the first of three "significant issues
> [that] were considered to have a direct influence" on the development
> and approval of the Trapper Timber Sale in 2003. AR 4410-11. The
> Trapper Timber Sale is located in an Adaptive Management Area
> ("AMA"), where agency efforts are focused on innovative research,
> monitoring, and scientific study of forest management techniques. AR
> 2380 (Plaintiffs' Exhibit 1 at 6-16); *see also* AR 4219 (The purpose
> of the AMAs is "to encourage the development and testing of
> technical and social approaches to achieving desired ecological,
> economic, and other social objectives"). According to a 2010 letter
> from a group of Forest Service scientists, however, the research value
> of the Trapper Timber Sale is "very low" today compared to when the
> project was planned:

'The value of anticipated lessons from going forward with logging of the Trapper Timber Sale is very low relative to what was anticipated when the sale and associated monitoring plans were developed in the 1990s. At that time it was expected that logging in mature (80-200 yrs) and even old-growth (200+ yrs) native forest would be a substantial part of the harvest from Forest Service lands under the Northwest Forest Plan in the coming decades. Harvest is now dominantly thinning in plantations and young post-wildfire stands. *Therefore, logging Trapper will not yield stand-level lessons of high value for contemporary logging practices.* AR 5018 (emphasis added).

The agency's scientists expressed that focusing research on more modern collaborative practices "has greater value than moving forward with a highly contentious timber sale," and they "do not oppose efforts to drop the Trapper Timber Sale." *Id.* The recent opinions of the agency's own experts undermine the central premise for the Trapper Timber Sale's development and approval, but the Forest Service has made no attempt to supplement its analysis or revisit its 2003 decision in light of this significant new information. Second, in 2003 the Forest Service repeatedly documented its belief that the proposed logging was "not likely to adversely affect" northern spotted owls. AR 4230, 4413, 4448. As a direct and specific result of this belief, the impacts to spotted owls were "dismissed" as an insignificant issue in the 2003 environmental assessment, "eliminated from detailed study," and "did not have a direct influence" on the 2003 decision. AR 4230, 4413. It was also one of the listed reasons why the Forest Service did not analyze the impacts of logging in a full environmental impact statement ("EIS"), AR 4416, and was a basis for denying Plaintiffs' administrative appeal. AR 4448.

Today, the Forest Service acknowledges that the "not likely to adversely affect" determination from 2003 was wrong, and that the Trapper Timber Sale is in fact likely to adversely affect northern spotted owls and their habitat. AR 5068 ("the Trapper project may affect and is likely to adversely affect this northern spotted owl pair by removal of habitat and cause harm to the pair by impairing its opportunity to forage and raise young"); AR 5264 (U.S. Fish and Wildlife Service (USFWS) concurs that the Trapper Timber Sale "is likely to adversely affect spotted owls"). This change is significant because it obviates the basic factual assumption that was used by the Forest Service to: (1) limit the scope and content of the environmental

analysis, (2) exclude impacts to a threatened species from the development of the project alternatives, and (3) narrowly define what factors influenced the final decision. The Forest Service has made no changes or supplements to the content or scope of the 2003 environmental analysis, nor any attempt to revisit the 2003 decision, which were based explicitly on the incorrect "not likely to adversely affect" determination. Significant new information also exists about the location of spotted owls in and around the planning area, and about impacts that logging will have on spotted owls and red tree voles that the Forest Service has not assessed.

Third, the market for wood products has declined significantly since 2003, and as a result the Forest Service agreed in 2009 to reduce the price of the Trapper Timber Sale by 63% - from 117.25/CCF (CCF =100 cubic feet) to 43.73/CCF. AR 5015. "Logging economics" is another one of three "significant issues" that had "a direct influence on the decision" and was used by the Forest Service to shape the development of the Trapper Timber Sale. AR 4410-12. However, the Forest Service has not addressed these changes in economic circumstances in a supplemental EA or new decision. 40 C.F.R. § 1508.8 (requiring the Forest Service to consider economic factors in the analysis of a project's effects). The dramatic reduction in the price of the Trapper Timber Sale is also significant because it affects the Forest Service's ability to fund, and therefore implement, the restoration and mitigation measures that the environmental analysis and finding of no significant impact were premised upon. *See* AR 4386 (listing restoration projects that would be funded by receipts from logging).

Collectively, this new information raises serious questions about whether the rationale for approving the Trapper Timber Sale in 2003 is still legally sound. The Forest Service failed to address these questions when it decided, in December 2010 and in response to this litigation, that there was no need to supplement its analysis or reconsider its 2003 decision.

Plaintiff's Opening Memorandum (#19 at 6-9).

//

//

//

Page 10 - ORDER

4. Summary of Defendants' Response to Plaintiff's Challenge

The Forest Service and Seneca essentially respond that there is no new significant information relevant to environmental concerns and that the agency's decision not to supplement the Project EA was not arbitrary and capricious and thus should be upheld under the APA.

Regarding the alleged change in the research value of the Project, the defendants counter that Trapper was never designed as a "research project" nor was it ever meant to yield "stand -level lessons about contemporary logging practices." Rather, it was designed to yield information that will help researchers and land managers better understand the role of ecological disturbances, particularly fire, on forest health and to learn about forest management strategies through the monitoring and adaptive management approaches contained in the BRCS. Seneca further contends that the 2010 letter from the three Forest Service scientists do not relate to environmental concerns associated with the effects of the Trapper Project and thus provide no basis for a supplemental NEPA document.

With respect to the allegedly new information that the Project will "likely adversely affect" (LAA) the northern spotted owl species, the Forest Service and Seneca contend that this is not "new" at all as the Forest Service was consistently informed of such in the various Biological Opinions (BOs), Biological Assessments (BAs), and Biological Evaluations (BEs) available to the decision maker at the time the Decision Notice was signed in 2003. Thus the "not likely to adversely affect" the spotted owl findings in the EA and the Decision Notice are described by the defendants as "scrivener errors" and "clerical errors" which should be read as the opposite conclusion, i.e. "likely to adversely affect," or the conclusion "not likely to jeopardize" the continued existence of the species.

Page 11 - ORDER

Finally, regarding the "logging economics" issue, the government contends that there is no indication in the record that the price to be paid by Seneca for the timber played any role in the Forest Service's decision to approve the Project. Rather, the "logging economics"stated in the EA as a basis for development of alternatives involve the cost of operational expenses, as that determines the extent of the roads that need to be built as part of the Project. *See* AR 4230 ("In general, helicopter logging is more expensive to accomplish per thousand board foot of timber than ground-based or skyline harvesting. Logging using ground-based or skyline operations may require the building of roads to support the operation.") Accordingly, the Forest Service's interest in this issue is with the cost of harvest method, not the unit price for timber. *See* AR 4412 (Alternative B addresses the issue of logging economics by proposing to minimize the amount of expensive helicopter logging.")

In addition, Seneca argues that it is pure speculation for Cascadia to assert that a market-related decrease in the price of Trapper timber will lead to previously-unassessed environmental effects from Trapper (e.g., lessened mitigation).

### III. FINDINGS AND CONCLUSIONS OF LAW

The court will address the triad of information cited by the plaintiffs as the basis for a mandatory supplemental EA in inverse order.

### 1. Logging Economics

The EA identified three "significant issues" which "drove the development of alternatives"-1) Learning and the Adaptive Management Area; 2) Water Quality/ Aquatic Resources; and 3) Logging Economics. AR 4228-4230.

With respect to "Logging Economics," the EA did not address the market price of timber to be sold under two of the alternatives being considered (Alternatives A and B), but focused only on operational expenses. The logging system cost of Alternative A was calculated at $3,683,831 and that of Alternative B at $2, 710, 938 (AR 4229). The lower system cost of B is attributable to a reduction in "the amount of expensive helicopter logging." Decision Notice AR 4412. *See also*, EA AR 4278.

The market value of the Trapper timber is not analyzed or mentioned in the EA. Furthermore, plaintiffs cite no information in the record from which the Forest Service could have or should have drawn an inference that a lower market value and reduction in price in 2009 may result in a reduction of the mitigation measures required by the Project – and thus a more significant impact on the environment than anticipated by the EA. *See* C.F.R. §1508.14; *Ashley Creek Phosphate Co., v. Norton*, 420 F.3d 934, 942 (9th Cir. 2005).

In addition, I agree with Seneca that the "timber economics" cases relied upon by plaintiffs are readily distinguishable. Both cases involve the Tongass National Forest. Under the Tongass Timber Reform Act (TTRA), the Forest Service must seek to provide a supply of timber from the Tongass National Forest that meets market demand. 16 U.S.C. §539d(a). Coupling that TTRA requirement with NEPA, the Forest Service must fully inform the public and the decision maker of the relevant factors considered in seeking to meet that timber demand on the Tongass. *Natural Res. Defense Council v. U.S. Forest Serv.*, 421 F.3d 797, 811 (9th Cir. 2005). Under the also-applicable National Forest Management Act (NFMA), the Forest Service must properly balance multiple use goals on the Tongass National Forest – including "recreation, environmental protection, and timber harvest" – without elevating any one leg of "this tripodal balance" above the others. *Id.*, at 808-09,

Page 13 - ORDER

809 n.22. And at the same time, the Tongass National Forest is prohibited by Congress from offering deficit timber sales (sales in which the appraised value of the timber is less than the cost os harvesting the timber). *See, e.g.*, Consolidated Appropriation Act, 2008, Pub. L. No. 110-161, § 410, 121 Stat.1844 (2007) (stating that "[n]o timber sale in Region 10 shall be advertised if the indicated rate is deficit when appraised using a residual value approach that assigns domestic Alaska values for western red cedar"). Given these intertwined Congressional mandates unique to the Tongass National Forest, it necessarily follows that on the Tongass, the Forest Service must consider and disclose timber sale economics in its analysis of timber demand and the manner in which the agency plans to meet that demand.

In short, the "market demand" requirement is a unique provision of the TTRA and is inapplicable on the Willamette National Forest. The plaintiffs' effort to equate the Tongass cases to the Trapper Project are unavailing. Thus, I reject the argument that the Forest Service was required to conduct a supplemental EA based on lower market values for the Trapper timber in 2009 compared to 2003.

2. The Spotted Owl

After thoroughly reviewing the relevant portions of the record, I am unable to conclude that the "not likely to adversely affect" (NLAA) the spotted owl findings in the 2003 EA and Decision Notice and FONSI document were mere clerical errors that should be disregarded when considering whether subsequent information regarding adverse impacts on the species is significant or new.

As noted above in my analysis of the "Logging Economics" issue, the EA identified three significant issues. It then went on to discuss "Other Issues" under which heading is found the following commentary:

Page 14 - ORDER

> Forest Service regulations (1950, Chapter 11 (3)) require that issues
> that are not significant to the project or that have been covered by
> prior environmental review be identified and eliminated from detailed
> study. Discussion of these issues is limited to a brief statement of
> why they will not have a significant effect on the human environment
> or a reference to their coverage elsewhere. These 'Other issues' were
> considered during project development, but did not "drive' alternative
> development. They are ameliorated through mitigation measures or
> application of Standards and Guidelines.

AR 4230.

The "Threatened Northern Spotted Owl" was listed as a non-significant issue with this

explanation:

> Activities that alter or remove older-forest habitats may affect the
> northern spotted owl. The degree of the affect varies by the proximity
> of the action to known nest sites and the amount fo habitat that will
> remain within a home range. Long-term landscape management
> strategies can impact effectiveness of the arrangement of spotted owl
> habitat on the landscape.
>
> Surveys of the proposed project area have documented the presence
> of spotted owls and their habitat. Consultation with the USFWS has
> resulted in a *'may affect, but not likely to adversely affect'*
> *determination.*   All applicable protection measures from the
> consultation will be included in the decision.

AR 4230 (emphasis supplied).

Trapper Appendix D to the EA contains contradictory information regarding the impact of

the Project on spotted owls. Table 1 ("Biological Evaluation process for wildlife species for the

Trapper Project") reflects the "analysis of significance" for the northern spotted owl to be "May

affect, not likely to adversely affect." AR 4337. This is contradicted by the subsequent observation

under the category "Communications with the U.S. Fish and Wildlife Service" that "Alternatives A

and B of the Trapper Project May Effect and is Likely to Adversely Affect the Northern Spotted

Owl." AR 4347.

Page 15 - ORDER

Regardless of the "LAA" references in the Appendix, the "NLAA" finding in the body of the

EA clearly was the driving force in the Decision Notice and Finding of No Significant Impact

(FONSI) document (AR 4396). Under the section discussing the "Threatened Northern Spotted

Owl" issue, we find:

> Activities that alter or remove older-forest habitats may affect the
> northern spotted owl. The degree of that affect varies by the
> proximity of the action to known nest sites and the amount of habitat
> that will remain within a home range. Long-term landscape
> management strategies can impact the effectiveness of the
> arrangement of spotted owl habitat on the landscape.
>
> Surveys of the proposed project area have documented the presence
> of spotted owls and their habitat. Consultation with the USFWS has
> resulted in a *'may affect, but not likely to adversely affect'*
> *determination.* All applicable protection measures from the
> consultation will be included in the decision.

AR 4413 (emphasis supplied).

Again, under the heading "Finding of No Significant Impact," there is the following

comment:

> Biological Evaluations (BEs) for the Proposed, Endangered,
> Threatened, and Sensitive wildlife, fish, and botanical species have
> been completed and are located in the appendix of the environmental
> assessment. The BEs indicated that the proposed project will have no
> significant effects or adverse impacts to any species or their habitats.

AR 4416.

As with the EA, there are contradictory references in the Appendices to the Decision Notice

and the FONSI that contain the "LAA" conclusions. *See* AR 4466, 4469, 4471. But these are not

cited or discussed in the body of the Decision Notice signed by the District Ranger (John Allen) on

May 12, 2003.

Page 16 - ORDER

Adding to the conclusion that the "NLAA" finding was critical to the Decision Notice and

FONSI is the reason given for the Regional Forester's denial of plaintiffs' appeal from that decision.

To quote from the letter of denial:

> This constitutes my decision, pursuant to 36 Code of Federal
> Regulations Part 215, on your appeal (03-06-025-15) of District
> Ranger John Allen's Decision Notice and Finding of No Significant
> Impact for the Trapper Project Environmental Assessment, on the
> McKenzie River Ranger District, Willamette National Forest. After
> a thorough review, I affirm Ranger Allen's decision as described in
> the Decision Notice.
>
> I have reviewed the appeal record for the project. The record includes
> Environmental Assessment, the Decision Notice, the project analysis
> records, and the Appeal Reviewing Officer's recommendation. A
> copy of this recommendation is enclosed.
>
> Based on the decision documentation and the Appeal Reviewing
> Officer's recommendation, I support Ranger Allen's decision and
> deny your requested relief.
> This decision constitutes the final administrative determination by the
> U.S. Department of Agriculture and is not subject to further
> administrative review.

AR 4445.

The Appeal Reviewing Officer's recommendation, expressly relied upon by the Regional

Forester, included the following statement:

> Appeal Issue #1: Project results in degrading, downgrading, and
> removing Critical Habitat for Northern Spotted Owl:
>
> Response: The Biological Evaluation and Environmental Assessment
> discloses the amount of owl habitat that will be affected and a *May
> Affect-Not Likely to Adversely Affect determination was made.*
> Consultation with the USDI Fish and Wildlife Service was conducted
> and a Biological Opinion provided with the determination that the
> "project is not likely to jeopardize the continued existence of the
> spotted owl or result in the destruction or adverse modification of
> spotted owl critical habitat." The project complies with the terms and
> conditions of the Biological Opinion. All requirements under the

Page 17 - ORDER

> Endangered Species Act, Northwest Forest Plan, and Willamette
> Forest Plan have been met (EA, pages 28, 63-65, DN/FONSI
> Appendix A, page 23).

AR 4448 (emphasis supplied).

Thus while certain layers of the Forest Service were undoubtedly aware of the LAA determination, the EA contained a critical NLAA determination regarding the northern spotted owl which carried over to the Decision Notice and FONSI by the District Ranger and the denial of plaintiff's appeal by the Regional Forester. This was no "clerical error." It was instead a cornerstone of the Trapper Project decision.

The defendants cite to a Forest Service Supplemental Information Report (SIR) for the Trapper Timber Sale for its findings that "(t)here are no significant new circumstances or information relevant to the effects of the timber harvest on NSO beyond the scope and range of effects considered in the original Trapper Project Analysis." AR 5285. This document (dated December 14, 2010) concludes that the NLAA determinations in the 2003 EA and FONSI were misstatements and that "taken as a whole" the actual basis was the LAA determination. Accordingly, the SIR concluded that no additional NEPA analysis was needed for the Trapper Project. AR 5287.

However, the SIR ignores the impact of the express NLAA determination in the EA which carried over to the Decision Notice and FONSI and was further cited as the basis for the denial of the administrative appeal.

Although I have rejected plaintiffs' argument that changes in the market value of Trapper Timber requires a supplemental NEPA analysis (for the reasons set forth above) I nonetheless find Ninth circuit caselaw from the "Logging Economics" discussion, supra, to be instructive on the

NLAA error in the 2003 EA. Thus, in NRDC, supra, the Ninth Circuit held that substantial changes in timber market conditions that affected timber sales prices required supplemental NEPA analysis, explaining that "inaccurate economic information may defeat the purpose of an EIS by 'impairing the agency's consideration of the adverse environmental effects' and by 'skewing the public's evaluation of the proposed agency action." *Natural Res. Defense Council,* 421 F.3d at 811 (*quoting Hughes River,* 81 F.3d 437 (4th Cir. 1996) *and citing Nat'l Wildlife Fed'n,* 235 F. Supp 2d 1143, 1157 (W.D. Wash. 2002) ("an EIS that relies upon misleading economic information may violate NEPA *if the errors subvert NEPA's purpose of providing decision makers and the public an accurate assessment upon which to evaluate the proposed project.*"))(emphasis supplied) . Ultimately, the Ninth Circuit concluded "that the Forest Service presented misleading economic effects of the Plan significant to its evaluation of alternatives considered by the Plan *and the public was similarly misled in its opportunity for comment.* We hold that the Forest Service violated NEPA's procedural requirement to present complete and accurate information to decision makers and to the public to allow an informed comparison of the alternatives considered in the EIS." *Natural Res Defense Council,* 421 F.3d at 813 (emphasis supplied).

Likewise, the public evaluation process of the proposed agency action and its impact on the environment was skewed by the inaccurate and misleading "not likely to adversely impact" the northern spotted owl determination in the EA. As noted, this NLAA determination carried over to the Decision Notice/FONSI and the denial of the administrative appeal. The error cannot be swept aside or corrected with an errata sheet years after the fact. The public is entitled to be accurately informed of the impact of the proposed action on the NSO and to have a meaningful opportunity to weigh in on the proposal during the period for public review and comment. See, *e.g..,* Forest Service

Page 19 - ORDER

Notice to "Interested Public" regarding the Trapper Project dated March 31, 2003 informing the public that "[t]he McKenzie River Ranger District has prepared an Environmental Assessment (EA) for the Trapper Project. It is now available for 30-day public review and comment. The EA can be viewed on the Willamette National Forest web site..." AR 4212. The 2003 EA contained a material error on the Trapper Project's expected impact on a threatened species (NSO) which error was not acknowledged by the Forest Service until 2010. This acknowledgment is new and significant information that cannot be overcome by an in-house SIR by the agency. Central decisions affecting the analysis and approval of the Trapper Timber Sale were based on a factual inaccuracy and the public has yet to be informed of the actual findings (LAA as opposed to NLAA) so it can engage in meaningful input. "It is inconsistent with NEPA for an agency to use a SIR, rather than a supplemental EA or EIS, to correct this type of lapse." *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000). *Also see Seattle Audubon Society v. Epsy*, 998 F.2d 699, 704 (9th Cir. 1998) (an agency must re-examine its decision when the EIS "rests on stale scientific evidence *and false assumptions*") (emphasis supplied).

Viewed in this light, the Forest Service's subsequent acknowledgment that the 2003 NLAA determination was incorrect and that Trapper is in fact likely to adversely affect the northern spotted owls and their habitat is both new and significant information. Accordingly, the agency's failure to prepare a supplemental EA (or EIS) was an abuse of discretion.

3. Research and Monitoring/Learning

As noted previously, a recent letter (referred to as the "Spies letter") from three Forest Service scientists involved with the Blue River Landscape Strategy expressed a consensus that

> (t)he value of anticipated lessons from going forward with logging of
> the Trapper Timber Sale is very low relative to what was anticipated
> when the sale and associated monitoring plans were developed in the
> 1990s. At that time it was expected that logging in mature (80-200
> yrs) and even old-growth (200 + years) native forest would be a
> substantial part of the harvest from Forest Service lands under the
> Northwest Forest Plan in the coming decades. Harvest is now
> dominantly thinning in plantations and young post-wildfire stands.
> Therefore, logging Trapper will not yield stand-level lessons of high
> value for contemporary logging practices.

AR 5018.

As plaintiffs note, "Learning and the Adaptive Management Area" was identified in the 2003

EA as one of three "significant issues" which "drove the development of alternatives." AR 4228-

4230. Indeed, the EA specifically identifies "Intensive research on ecosystem and landscape

processes and its application to forest management in experiments and demonstrations on the stand

and watershed level" as an objective in Chapter 1 of the EA, entitled "Purpose and Need for Action."

This "learning" theme is reiterated throughout the EA. *See, e.g.*, AR 4226:

> The purpose of the Adaptive Management Area (AMA) is to
> 'encourage the development and testing of technical and social
> approaches to achieving desired ecological, economic, and other
> social objectives.' While the management areas outside of AMAs,
> such as matrix and reserve lands, is grounded in a set of prescriptive,
> region-wide standards and guidelines, AMAs are recognized as areas
> where innovation, testing, and experimentation are both expected and
> appropriate. They are places where learning leads to validating or
> changing how resources are managed.

*See also*: Chapter 4 of the EA, analysis of "Learning and the Adaptive Management Area." AR

4269.

It is thus apparent that the main purpose of the Trapper timber sale was to apply the lessons

learned from the project to forest management over the ensuing decades. The Spies letter (which

Page 21 - ORDER

was transmitted on May 27, 2010) calls into question the learning value of the Trapper sale, but the Forest Service did not evaluate it or otherwise address it in its SIR of December 14, 2010.

In *Marsh*, the Supreme Court applied a "rule of reason" as the standard governing an agency's decision whether to prepare a supplemental EIS, and observed that application of the rule is a function of the value of the new information to the still pending decision making process.

> In this respect, the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare a EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. Cf. 42 U.S.C. §4332(2)(C).

*Marsh*, 490 U.S. at 374.

In this case, I have found that errors in the 2003 EA regarding the impact of the Trapper Project on the northern spotted owl mandate a supplemental EA given the agency's recent acknowledgment of those errors. Given the new information from three agency scientists calling into question the learning value of the action, such should also be addressed in the supplemental EA.

In this regard, I reject Seneca's argument that, even if the learning value of Trapper is significantly lower now than anticipated in 2003, such does not require a supplemental NEPA analysis because it is untethered to any new potential impacts on the physical environment from the Trapper implementation.

As plaintiffs point out, the Forest Service must consider the "effects" of a project on the "human environment", and this specifically includes social, economic, and cultural effects. 40 C.F.R. §1508.8 ("Effects includes ecological ..., aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative"); 40 C.F.R. § 1508.14 ("Human environment" shall

Page 22 - ORDER

be interpreted comprehensively to include the natural and physical environment *and the relationship of people to that environment*)(emphasis supplied). *See Marsh*, 490 U.S. at 374 (supplemental EIS is required where "the new information is sufficient to show that the remaining action will *affect* the quality of the *human environment* in a significant manner or to a significant extent not already considered")(emphasis supplied). Moreover, a supplemental EA is required when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action *or* its impacts." 40 C.F.R. §1502.9 (c ) (emphasis supplied).

Certainly, the underlying reason for a proposed action having impacts on the environment is relevant to environmental concerns associated with that action. If the asserted basis for the Trapper Project had been to generate revenue, the rationale of the Tongass cases would apply and plaintiffs would have a much stronger argument that a 63% drop in the Trapper timber price in the ensuing years should trigger a supplemental EA. Here, the EA clearly articulates that Trapper is designed as a learning/research project.[3] Such is the dominant reason for the action. Accordingly, if there is new information that calls into question the learning value of the project, it should be evaluated as part of a supplemental EA. Furthermore, it does not matter that the Spies letter does not represent official Forest Service opinion. 40 C.F.R. & 1502.9(b) (requires agencies to consider "any responsible opposing views"). *See also*: *Ctr. for Biological Diversity v. U.S. Forest Serv.,* 349 F.3d 1157, 1168 (9th Cir. 2003) (NEPA requires agencies to "disclose and discuss the responsible opposing views"); *State of Cal. V. Block*, 690 F.2d 753, 770-71 (9th Cir 1982) (NEPA "reflects the

---

[3]Much of the Trapper Project is planned within riparian areas (AR 4407-08) where logging is generally prohibited (AR 2371.0159). The proposed logging in riparian areas is only permitted here because the standards and guidelines allow for flexibility in AMAs "to conduct bona-fide research projects within riparian zones." AR 4300.

Page 23 - ORDER

paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision."); *Shiffer v. Schlesinger*, 548 F.2d 96, 100 (3rd Cir. 1977)(In enacting NEPA, Congress imposed "a substantial obligation upon all federal agencies to balance the environmental considerations ... along with the traditional factors of public interest ... thus ... the agency must determine whether [the] benefit [of an action] is outweighed by negative environmental implications requiring modifications to, or abandonment of the proposed action.")

## IV. ORDER AND INJUNCTIVE RELIEF

Plaintiffs' Motion for Summary Judgment (#18) is granted for the reasons set forth above. The Forest Service's failure to conduct a supplemental EA or EIS and issue a supplemental Decision Notice was arbitrary and capricious. The Defendants' Motions for Summary Judgment (#26 and #29) are denied for the same reasons.

In considering whether to issue the injunctive relief requested by plaintiffs in their complaint (#1), the court considers the balance of equities and the public interest. *See Winter v. NRDC*, 555 US 7, 129 S.Ct. 365, 381 (2008). As the Court observed in *Amoco Prod. Co. v. Village of Campbell*, 480 U.S. 531, 544 (1987), "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."

Seneca contends that economic interests (creation of jobs, production of lumber, and the use of byproducts for renewable energy) are "not inferior" to the environmental harms asserted by plaintiffs. But I note that the Trapper Project was designed to yield research results over the span

Page 24 - ORDER

of many decades, and that the sale has been delayed for eight years for reasons other than this litigation. If the Forest Service, after preparing a supplemental EA, makes the Decision to go forward with Trapper, any economic benefit may have been delayed in the interim, but not extinguished.

On the other hand, it would be an academic exercise to order the Forest Service to prepare a supplemental EA and Decision Notice on the Trapper sale while allowing the project to be implemented prior to completion of those documents. NEPA exists so "that [an] agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh,* 490 U.S. at 371. The public interest is extremely high in having federal agencies take a "hard look" at the environmental consequences of their proposed actions in advance of a final decision to proceed with that action. If the Forest Service were to conclude after the supplemental EA process that new information warrants a modification or withdrawal of Trapper, it would be "too late to correct" the action if the project had already gone forward.

Accordingly, the Trapper Timber sale is enjoined pending the agency's preparation of a supplemental EA addressing the new information regarding the Northern Spotted owl and learning value of the project and a supplemental Decision Notice.

IT IS SO ORDERED.

DATED this **24** day of May, 2011.

THOMAS M. COFFIN
United States Magistrate Judge

Page 25 - ORDER